DECISION AND JOURNAL ENTRY
{¶ 1} Defendant-Appellant, Minaxiben Pravinbhai Patel ("Minaxi"), appeals from her convictions in the Summit County Court of Common Pleas. This Court affirms.
 I {¶ 2} Prior to July 1, 2005, Minaxi lived with her son, Chetankumar Pravin Patel ("Chetan"), and his wife, Sejal Patel. At approximately 5:30 p.m. on July 1, 2005, Chetan went to the Twinsburg police station and reported his wife missing. Chetan told officers that he hoped no one had "kidnapped and murdered" Sejal. According to Chetan and his family, Sejal had left for work earlier that morning in the family's Mercedes Benz, but never arrived. The family allegedly became concerned when Sejal failed to answer her cell phone and other extended family members indicated that they had not heard from her.
 {¶ 3} On the morning of July 2, 2005, Chetan telephoned the Twinsburg Police Department and notified officers that he had located the black Benz that Sejal had taken to work. *Page 2 
Officer Brian Donato drove to the Chrysler Stamping Plant parking lot and found Chetan waiting in his Nissan Pathfinder next to the Benz. Officer Donato inspected the Benz from its exterior, but the sun glare largely prevented him from seeing through the vehicle's tinted windows. When Officer Donato cupped his hands and peered through the Benz' rear cargo side passengers' window, however, he saw what appeared to be a rolled up blanket. He asked Chetan if he knew what the object might be. Chetan responded in the negative, but then became alarmed and exclaimed, "that's my wife!" Once other officers arrived, they opened the Benz' hatch and discovered Sejal's body wrapped in a blanket.
 {¶ 4} On June 18, 2007, the grand jury indicted Minaxi, Sejal's mother-in-law, on the following counts: aggravated murder, pursuant to R.C. 2903.01(A); tampering with the evidence, pursuant to R.C. 2921.12(A)(1); and abuse of a corpse, pursuant to R.C. 2927.01. The grand jury also indicted Chetan, his lover, Rupal Patel, and her roommate, Vijaykumar Patel ("Vijay"), based on the theory that all of the aforementioned individuals conspired to murder Sejal. Before trial, both Rupal and Vijay entered into plea bargains and agreed to testify against Minaxi and Chetan. Minaxi's and Chetan's cases were consolidated for trial.
 {¶ 5} On October 29, 2007, the matter proceeded to a jury trial. Subsequently, the jury found Minaxi guilty on all counts, and the trial court sentenced her to a total of twenty-five years to life in prison with the possibility of parole and five years of post-release control.
 {¶ 6} On January 2, 2008, Minaxi filed her notice of appeal. Minaxi's appeal is now before this Court and raises six assignments of error for our review.
 II Assignment of Error Number One "THE VERDICT OF THE TRIAL COURT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE SINCE THE STATE OF OHIO FAILED TO *Page 3 
PROVE EACH AND EVERY ELEMENT OF THE CRIME[S] OF AGGRAVATED MURDER, TAMPERING WITH EVIDENCE AND ABUSE OF A CORPSE BEYOND A REASONABLE DOUBT."
 Assignment of Error Number Two "THE TRIAL COURT ERRED WHEN IT OVERRULED A TIMELY DEFENSE MOTION FOR ACQUITTAL PURSUANT TO CRIMINAL RULE 29 AS THERE WAS NOT SUFFICIENT EVIDENCE PRESENTED BY THE STATE OF OHIO TO ESTABLISH A PRIMA FACIE CASE OF AGGRAVATED MURDER, TAMPERING WITH EVIDENCE AND ABUSE OF A CORPSE TO WARRANT THE CASE BEING SUBMITTED TO THE JURY."
 {¶ 7} In her first and second assignments of error, Minaxi argues that her convictions for aggravated murder, tampering with the evidence, and abuse of a corpse are based on insufficient evidence and are against the manifest weight of the evidence. We disagree.
 {¶ 8} A review of the sufficiency of the evidence and a review of the manifest weight of the evidence are separate and legally distinct determinations. State v. Gulley (Mar. 15, 2000), 9th Dist. No. 19600, at *1. "While the test for sufficiency requires a determination of whether the state has met its burden of production at trial, a manifest weight challenge questions whether the state has met its burden of persuasion." Id., citing State v. Thompkins (1997), 78 Ohio St.3d 380, 390 (Cook, J., concurring). In order to determine whether the evidence before the trial court was sufficient to sustain a conviction, this Court must review the evidence in a light most favorable to the prosecution. State v.Jenks (1991), 61 Ohio St.3d 259, 274. Furthermore:
 "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." Id. at paragraph two of the syllabus; see, also, Thompkins, 78 Ohio St.3d at 386. *Page 4 
In State v. Roberts, this Court explained:
 "[S]ufficiency is required to take a case to the jury[.] * * * Thus, a determination that [a] conviction is supported by the weight of the evidence will also be dispositive of the issue of sufficiency." (Emphasis omitted.) State v. Roberts (Sept. 17, 1997), 9th Dist. No. 96CA006462, at *2.
Accordingly, we address Minaxi's challenge to the weight of the evidence first, as it is dispositive of her claim of sufficiency.
 {¶ 9} In determining whether a conviction is against the manifest weight of the evidence an appellate court:
 "[M]ust review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Otten (1986), 33 Ohio App.3d 339, 340.
A weight of the evidence challenge indicates that a greater amount of credible evidence supports one side of the issue than supports the other. Thompkins, 78 Ohio St.3d at 387. Further, when reversing a conviction on the basis that the conviction was against the manifest weight of the evidence, the appellate court sits as the "thirteenth juror" and disagrees with the factfinder's resolution of the conflicting testimony. Id. Therefore, this Court's "discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." State v. Martin (1983),20 Ohio App.3d 172, 175; see, also, Otten, 33 Ohio App.3d at 340.
 {¶ 10} Aggravated murder is defined in R.C. 2903.01(A), which reads in pertinent part: "No person shall purposely, and with prior calculation and design, cause the death of another[.]" "[T]he phrase `prior calculation and design' * * * indicate[s] studied care in planning or analyzing the means of the crime as well as a scheme encompassing the death of the victim." State v. Taylor (1997), 78 Ohio St.3d 15, 19. "Neither the degree of care nor the length of time the *Page 5 
offender takes to ponder the crime beforehand are critical factors in themselves, but they must amount to more than momentary deliberation."Taylor v. Mitchell (N.D.Ohio 2003), 296 F.Supp.2d 784, 820. "While a few fleeting moments of deliberation or instantaneous deliberations are inadequate to support prior calculation and design, `a prolonged period of deliberation is [also] unnecessary.'" State v. Hairston, 9th Dist. No. 05CA008768, 2006-Ohio-4925, at ¶ 80, quoting State v. Quinones (Oct. 14, 1982), 8th Dist. No. 44463, at *11; State v. Cotton (1978),56 Ohio St.2d 8, paragraph two of the syllabus.
 {¶ 11} R.C. 2921.12(A)(1) provides, in part, that:
 "No person, knowing that an official proceeding or investigation * * * is about to be or is likely to be instituted, shall * * * [a]lter, destroy, conceal, or remove any record, document, or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation[.]"
R.C. 2901.22(A) defines the mens rea of "purposely" as follows:
 "A person acts purposely when it is his specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature."
In determining whether a defendant acted purposely, "[a] defendant's state of mind may be inferred from the totality of the surrounding circumstances." State v. Sullivan, 9th Dist. No. 07CA0076-M,2008-Ohio-2390, at ¶ 10, citing State v. Harper (Mar. 29, 2000), 9th Dist. No. 19632, at *2.
 {¶ 12} Finally, R.C. 2927.01(B) provides that "[n]o person, except as authorized by law, shall treat a human corpse in a way that would outrage reasonable community sensibilities." Anyone who violates this section is guilty of felony abuse of a corpse. R.C. 2927.01(C). *Page 6 
 {¶ 13} Minaxi argues that her convictions are against the manifest weight of the evidence because the State failed to introduce any independent evidence of her culpability apart from the testimony of Rupal and Vijay, both of whom lacked credibility. We disagree.
 {¶ 14} Officer Darrin Fate of the Twinsburg Police Department testified that Chetan came to the police station at approximately 5:32 p.m. on July 1, 2005 to report Sejal missing. Chetan told Officer Fate that Sejal had left for work earlier that same morning in his black Benz, but never showed up. In his written statement, Chetan reported to Officer Fate that Minaxi had been at home when Sejal left for work. When Chetan telephoned Minaxi in search of Sejal, she told him that Sejal had left sometime around 10:00 a.m. and had taken lunch for everyone at work.
 {¶ 15} Officers James Tobak and Brian Donato both testified that they reported to the Chrysler Stamping Plant parking lot the afternoon of July 2, 2005 after receiving word that Chetan had found the Benz that Sejal allegedly had driven to work the previous day. Officer Donato testified that after reviewing the surveillance tapes from the parking lot, he estimated that the Benz had been placed in the parking lot at approximately 10:18 a.m. on the morning of July 1, 2005.
 {¶ 16} Detective James Scarl, another Twinsburg police officer investigating Sejal's case, testified that Minaxi gave several inconsistent statements during the course of the investigation. According to Minaxi, Sejal took food for everyone with her when she left for work and also placed her cell phone in her pocket. Detective Scarl clarified, however, that the police did not find either food or Sejal's cell phone in the Benz along with her body. Detective Scarl opined that given his experience and the evidence uncovered in Sejal's case, he directed the *Page 7 
investigation at Sejal's family and quickly abandoned any theory that a stranger had abducted and murdered Sejal.
 {¶ 17} Dr. George Sterbenz, the Chief Deputy Medical Examiner for Summit County, testified that he examined Sejal's body and performed her autopsy. Dr. Sterbenz noted that Sejal was fully clothed when the police found her, but did not have on any shoes or socks. He further noted that Sejal had bruising on her left leg, marks on her neck, several blunt force injuries to her face and scalp, and petechia of the face. Dr. Sterbenz opined that Sejal died from a combination of manual and ligature strangulation over the course of several minutes. That is, she died from a stoppage in blood flow to the brain due to force being applied to her neck by someone's hands and by an object. Dr. Sterbenz found a green string or thread in one of the folds of Sejal's neck. Although he could not pinpoint Sejal's time of death because of the hot temperatures in the Benz where she was found, Dr. Sterbenz did note that he found money in Sejal's pockets when he removed her clothing and that she still had a necklace around her neck.
 {¶ 18} Chirag Patel, a friend of Chetan's family and a co-owner of one of Chetan's restaurants, testified that he had witnessed Sejal crying on at least one prior occasion because of the poor relationship that she had with Minaxi. Chirag testified that he arrived at work on July 1, 2005 at approximately 10:20 a.m. He stated that Chetan was already there when he arrived, but that Sejal never showed up. Chirag noted that he stopped at Chetan's house after work on the night of July 1st and entered the house through the garage. As he passed through the garage, Chirag saw that both pairs of Sejal's shoes were still in the garage.
 {¶ 19} Minaxi testified that she was at home on the morning of July 1, 2005. She testified that Sejal got ready for work and left at approximately 9:45 a.m., but that she did not actually see Sejal leave because she was in the backyard with her two grandchildren for about *Page 8 
twenty-five to thirty minutes. She also testified that she and Sejal had a great relationship and never fought. As to Chetan, Minaxi claimed that he and Sejal had a typical marriage and also never fought. Minaxi could not explain why the police did not find any food in the Benz with Sejal's body despite Minaxi's contention that Sejal had taken food with her to work on the morning of July 1st. The State further questioned Minaxi as to why Sejal did not have any shoes on when the police found her body if she had, in fact, been dressed for work. Several other witnesses testified that Indian custom forbade wearing shoes inside the home, so as to raise the inference that Sejal was killed inside her home before putting her shoes on to leave for work. Minaxi attempted to explain by suggesting that Sejal might have purchased another pair of shoes at Sam's Club the day before her death and her killer might have taken the shoes from her feet. Detective Kopinski testified, however, that he checked the receipts from Sejal's Sam's Club purchases and that Sejal had not purchased shoes.
 {¶ 20} Vijay Patel testified against Minaxi after pleading guilty to the aggravated murder of Sejal. Vijay testified that he had engaged in an affair with Minaxi while the two still lived in India. After Minaxi moved to the United States to live with her son and new daughter-in-law, she frequently spoke poorly of Sejal and told Vijay that she wanted to kill Sejal. According to Vijay, Minaxi attempted to have Sejal killed on three occasions before July 1, 2005. He indicated that Minaxi arranged to have his debts paid off upon his coming to the United States on the condition that he do whatever she asked. Vijay claimed that Minaxi knew of her son's affair with Rupal and of his displeasure with his marriage to Sejal. Further, Vijay claimed that Minaxi blamed Sejal for Chetan's trouble with the law. When the police arrested Chetan after a domestic disturbance that occurred while Minaxi was visiting India, Vijay stated that Minaxi called him from India and asked why he let "that bitch" get her son arrested. *Page 9 
 {¶ 21} Vijay testified to the following series of events regarding Sejal's murder. On the night of June 30, 2005, Minaxi called Vijay and Rupal, his roommate and Chetan's lover, at their residence and told them to be over Chetan's house in the morning. When the two arrived the next morning, Minaxi came out to the car and brought Vijay inside while indicating that Rupal should leave and return with the car in about half an hour. Vijay entered the house with Minaxi, and she gave him gloves to wear. Although Vijay told Minaxi that he did not wish to be involved, Minaxi threatened Vijay and his family, telling him that it would be easy to have him deported or killed or to pay someone in India to kill his family. Consequently, Vijay reluctantly went along with the murder.
 {¶ 22} As Vijay entered the room where Sejal was, he observed Chetan sitting on the sofa with Sejal's head on his lap. Chetan had a rope around Sejal's neck and was using it to strangle her. Chetan's father, Pravin Patel, held down Sejal's legs on the opposite end of the couch. Minaxi repeatedly struck Sejal in the leg while she was being strangled. Chetan also made Vijay hold onto the rope and help to strangle Sejal. During her murder, Sejal wore an old, faded blue t-shirt and black leggings. Once the murder was accomplished, Minaxi and Chetan changed Sejal into her work uniform, and the family carried her body out to the Benz. Minaxi gave Vijay $10,000 in cash and told him that he and Rupal had to drive Sejal's body to the Chrysler Stamping Plant parking lot. By then, Rupal had returned, and the family permitted her to take Vijay for some coffee before coming back to dispose of Sejal's body.
 {¶ 23} Once in the car, Rupal and Vijay traveled to the local Speedway gas station. Vijay told Rupal that he had helped kill Sejal, and the two discussed fleeing the area. Both Vijay and Rupal attempted to call Chetan's home to tell him and Minaxi that they were not coming back, but they could not establish a connection from the gas station phone. The two returned to *Page 10 
Chetan's house. Once again, Minaxi threatened them and their families, so they agreed to go forward with the plan. Minaxi handed Vijay a bag containing the clothing Sejal had on during the murder, her cell phone, the rope used to strangle her, and the gloves that the family had worn to murder her. Minaxi told Vijay that she had "cleaned the house * * * [and] gathered up all the clothes * * *, so there's no chances of us getting arrested. * * * [T]hey will feel that she was going to the store and somebody must have killed her on the way there and they must have left her there." She then instructed Vijay to go somewhere else after disposing of the body and to discard the items. Rupal drove the Benz to the Chrysler parking lot while Vijay followed her. After leaving the body, Rupal and Vijay drove away. During the drive, Vijay threw separate pieces of the evidence Minaxi gave him along the side of the road.
 {¶ 24} Vijay disclosed the full terms of his plea agreement to the jury. He further admitted that he did not tell police the whole truth at the beginning of the investigation when he initially claimed that he and Rupal had strangled Sejal. Minaxi uses the inconsistencies in Vijay's statement to argue that he clearly lied at trial to receive a favorable plea bargain. The record reflects, however, that Vijay implicated Minaxi in Sejal's murder in his first statement to the police. Moreover, even at trial, many of Vijay's inconsistencies appear to stem more from a language barrier than from an intentional desire to deceive. For example, the following exchange took place between Vijay and Chetan's counsel when Chetan's counsel questioned him about Sejal's death:
 "[COUNSEL]: Did you ever tell the police that you saw somebody beating on Sejal's chest?
 "[VIJAY]: I would have said, but I don't know right now.
 "[COUNSEL]: What does that mean, `but I don't know,' what does that mean?
 "[VIJAY]: I don't remember right now. *Page 11 
 "[COUNSEL]: [You don't] remember what [you] told the police?
 "[VIJAY]: I would not have said, but I'm not sure. Which statement are you talking about, the first one or the second one?
 "[COUNSEL]: Any statement.
 "[VIJAY]: I'm not sure, but I would have said it.
 "[COUNSEL]: What does that mean?
 "[VIJAY]: I would have said probably.
 "[COUNSEL]: So, he did tell the police that?
 "[VIJAY]: I would have said, so I would have said.
 "[COUNSEL]: Okay."
The trial transcripts are filled with similarly confusing testimony. Consequently, it seems entirely likely that officers had as much trouble understanding Vijay's answers during their investigation as defense counsel did during the trial. It would not be unreasonable to conclude that many of his "inconsistencies" actually stemmed from misunderstandings.
 {¶ 25} During her testimony, Rupal testified to the following series of events regarding Sejal's murder. Rupal and Chetan had a relationship in India before moving to the United States and continued to have a sexual relationship in the United States after he married Sejal. Both Chetan and Minaxi frequently complained about Sejal, who had married Chetan through an arranged marriage. Subsequently, both Chetan and Minaxi expressed a desire to kill Sejal, and Chetan told Rupal that she must come to his house on the morning of July 1, 2005 to carry out Sejal's murder. Rupal expressed the same version of events as Vijay with the exception of the details of Sejal's actual murder, which took place after Rupal dropped Vijay at the house and before she returned. Rupal indicated that Minaxi became nervous after Rupal and Vijay finished *Page 12 
dropping Sejal's body off at the Chrysler parking lot because they had forgotten to put Sejal's lunch in the car with her and to put her socks and shoes on her feet.
 {¶ 26} Rupal also fully disclosed the terms of her plea agreement to the jury. She admitted that she had initially misled police, but claimed that she had told inconsistent stories in an attempt to protect her lover, Chetan. As with Vijay's testimony, Minaxi claims that Rupal lied to secure a favorable plea bargain. Yet, the other evidence in the record corroborates Vijay's and Rupal's version of the events. Detective Scarl testified that the evidence supported the theory that Sejal's family, not a stranger, was responsible for her murder. The evidence comports with this theory because police found money in Sejal's pockets and a necklace on her neck, suggesting that she was not the victim of a robbery or theft crime. Further, the police estimated that the Benz containing Sejal's body was placed at the Chrysler Stamping Plant parking lot by approximately 10:18 a.m. on the morning of July 1st; only half an hour after Minaxi claimed that Sejal had left the home for work. When the police found Sejal's body, she did not have any socks or shoes on her feet. The shoes had been left at home, suggesting that she was killed in her home, where the Indian tradition considers shoes inappropriate for indoor wear. Sejal had bruising on her legs and ligature marks on her necks. These injuries comport with Vijay's testimony that Minaxi beat Sejal's legs while Chetan strangled her with a rope. Finally, police were never able to recover Sejal's cell phone, one of the items that Vijay admitted to throwing from the car as Minaxi instructed him to do.
 {¶ 27} While the State's case against Minaxi certainly would have been aided by additional direct evidence or testimony from sources lacking in potential bias or motive, we cannot agree that the Minaxi's convictions are against the weight of the evidence. In essence, Minaxi and her entire immediate family were involved in Sejal's death; a fact which severely *Page 13 
decreased the pool of unbiased, willing, and available witnesses. Our review of the record convinces us that the jury did not err in convicting Minaxi of aggravated murder, tampering with the evidence, and abuse of a corpse.
 {¶ 28} Having disposed of Minaxi's challenge to the weight of the evidence, we similarly dispose of her sufficiency challenge. SeeRoberts, supra, at *2. Minaxi's first and second assignments of error lack merit.
 Assignment of Error Number Three "THE TRIAL COURT ERRED IN ADMITTING CERTAIN HEARSAY TESTIMONY OF CERTAIN INDIVIDUALS AND THUS VIOLATED APPELLANT'S [SIXTH] AMENDMENT RIGHT TO CONFRONTATION AS WELL AS RELEVANT PROVISIONS OF THE OHIO STATE CONSTITUTION."
 {¶ 29} In her third assignment of error, Minaxi argues that the trial court erred in admitting various hearsay statements, as the admissions offended the Confrontation Clause and violated several evidentiary rules. Specifically, Minaxi challenges the admission of Sejal's and Chetan's children's statements, the statements of her alleged co-conspirators, and the statements of Rupal's former attorney, Joseph Gorman.
 {¶ 30} The question of whether a trial court properly admitted evidence and the question of whether that evidence offended a defendant's constitutional rights are separate inquiries subject to separate standards of review. See State v. Issa (2001),93 Ohio St.3d 49, 60-61; State v. Dever (1992), 64 Ohio St.3d 401, 415. A trial court possesses broad discretion with respect to the admission of evidence.State v. Maurer (1984), 15 Ohio St.3d 239, 265. This includes the discretion to determine whether evidence constitutes hearsay and whether it is admissible or inadmissible hearsay. See Dever,64 Ohio St.3d at 414; State v. Hand, 107 Ohio St.3d 378, 2006-Ohio-18, at ¶ 92-94;State v. Muttart, 116 Ohio St.3d 5, 2007-Ohio-5267, at ¶ 56; Statev. *Page 14 Hardison, 9th Dist. No. 23050, 2007-Ohio-366, at ¶ 4-5; State v.Brown, 9th Dist. No. 04CA008510, at ¶ 4-11; Prakash v. Copley Tp.Trustees, 9th Dist. No. 21057, 2003-Ohio-642, at ¶ 38-42. An appellate court will not disturb evidentiary rulings absent an abuse of the trial court's discretion. State v. Roberts, 156 Ohio App.3d 352,2004-Ohio-962, at ¶ 14. An abuse of discretion is more than an error of judgment; it means that the trial court was unreasonable, arbitrary, or unconscionable in its ruling. Blakemore v. Blakemore (1983),5 Ohio St.3d 217, 219. When applying the abuse of discretion standard, an appellate court may not substitute its judgment for that of the trial court. Pons v. Ohio State Med. Bd. (1993), 66 Ohio St.3d 619, 621.
 {¶ 31} On the other hand, "[q]uestions of the scope and effect of constitutional protections, such as the Sixth Amendment, are matters of law." State v. Hardison, 9th Dist. No. 23050, 2007-Ohio-366, at ¶ 15. This is because "technical rules of hearsay cannot defeat fundamental due process rights." State v. Landrum (1990), 53 Ohio St.3d 107, 115, citing Green v. Georgia (1979), 442 U.S. 95. As such, this Court reviews de novo the question of whether or not the admission of evidence offended a defendant's Sixth Amendment Confrontation Clause rights.Hardison at ¶ 15.
Statements of the Children {¶ 32} The proponent of an unavailable declarant's testimonial statement may not introduce that statement without the opposing party having been given a prior opportunity to cross-examine the declarant.Crawford v. Washington (2004), 541 U.S. 36, 68. Statements are testimonial when the circumstances objectively indicate that the primary purpose in obtaining them was to "establish or prove past events potentially relevant to later criminal prosecution." State v.Siler, 116 Ohio St.3d 39, 2007-Ohio-5637, paragraph one of the syllabus, quoting Davis v. Washington (2006), 547 U.S. 813. Nontestimonial statements are subject to general *Page 15 
evidentiary limitations, such as the hearsay rules, but do not offend the Confrontation Clause. State v. Crager, 116 Ohio St.3d 369,2007-Ohio-6840, at ¶ 43, citing Davis, 547 U.S. at 822.
 {¶ 33} Minaxi admits that she failed to object to the testimony of Dr. Nina Kucyk, a psychologist who interviewed Sejal's two children after Sejal's death, but argues that the admission of Dr. Kucyk's testimony was plain error. For plain error to exist, "there must be an error, i.e., a deviation from the legal rule[;] * * * the error must be plain [such that it constitutes] * * * an `obvious' defect in the trial proceedings[; and] * * * the error must have affected `substantial rights' [such that it] * * * affected the outcome of the trial." (Italics omitted.) State v. Payne, 114 Ohio St.3d 502, 2007-Ohio-4642, at ¶ 16, quoting State v. Barnes (2002), 94 Ohio St.3d 21, 27. Courts are to notice plain error "only to prevent a manifest miscarriage of justice." State v. Long (1978), 53 Ohio St.2d 91, paragraph three of the syllabus. The burden is on the party asserting plain error to prove that "the outcome `would have been different absent the error.'"Payne at ¶ 17, quoting State v. Hill (2001), 92 Ohio St.3d 191, 203.
 {¶ 34} Minaxi broadly asserts, without analysis, that Dr. Kucyk's testimony prejudiced her substantial rights because the testimony violated the Confrontation Clause and was more prejudicial than probative.[1] The record reflects that Dr. Kucyk testified as to her counseling sessions with R.P., Sejal's oldest son, who was seven years old at the time. With regard to Minaxi, Dr. Kucyk testified that R.P. indicated to her that Minaxi was at home along with at least eight other family members when Sejal was killed. At one point, however, R.P. told Dr. Kucyk that he thought twenty to thirty people were at home when Sejal was killed. Furthermore, the *Page 16 
evidence demonstrated that at least one of the people R.P. placed at the home, Sanjaybhui Patel, was in India when Sejal was murdered. We fail to see how this testimony prejudiced Minaxi's substantial rights. Minaxi herself testified that she was at home on the morning of Sejal's murder. The only remaining issue was whether Sejal was murdered at home or elsewhere. As previously discussed, the record reflects that Sejal's murder took place at the family home. Accordingly, Minaxi cannot demonstrate that R.P.'s statements affected the outcome of her trial. See Payne at ¶ 17. Moreover, Minaxi makes no attempt to explain why she believes that the statements R.P. made to his therapist were testimonial rather than non-testimonial; a prerequisite to any determination that a Confrontation Clause issue exists. See Crawford, 541 U.S. at 68
(applying the Confrontation Clause only to testimonial statements). As it is the duty of the appellant to demonstrate error through an argument supported by citations to the record and legal authority, this Court will not create an argument on Minaxi's behalf. See App. R. 16(A)(7). Minaxi has not demonstrated that the trial court erred in admitting R.P.'s statements. Thus, her argument that the trial court committed plain error lacks merit.
Co-Conspirators' Statements {¶ 35} Next, Minaxi argues that her co-conspirators, Rupal and Vijay, should not have been allowed to testify "as to what they heard Chetan and Minaxi say about or to other people." Specifically, she avers that the State failed to make a prima facie showing of the existence of the conspiracy by independent proof pursuant to Evid. R. 801(D)(2)(e). SeeState v. Carter (1995), 72 Ohio St.3d 545, paragraph three of the syllabus.
 {¶ 36} Evid. R. 801(D)(2)(e) allows a co-conspirator's statement to be admitted against a party, as if the statement were the party's own admission, if the State first proves (1) the existence of the conspiracy by other means, and (2) that the co-conspirator made the statement *Page 17 
"during the course and in furtherance of the conspiracy." On the other hand, a party's own statement, even if made during the course of a conspiracy, may be admitted under Evid. R. 801(D)(2)(a) without any prima facie showing regarding the conspiracy. See State v. Moore, 9th Dist. No. 05CA008762, 2006-Ohio-4926, at ¶ 8, fn.1.
 {¶ 37} Initially, we note that Evid. R. 801(D)(2)(e) would not prevent the admission of Minaxi's statements, even if relayed through Rupal and Vijay, as those statements were admissible pursuant to Evid. R. 801(D)(2)(a). See id. Moreover, Minaxi has not argued that the admission of Chetan's statements through her remaining co-conspirators, Rupal and Vijay, offended the Confrontation Clause. Accordingly, we need only consider the admission of Chetan's statements, Minaxi's co-conspirator, pursuant to Evid. R. 801(D)(2)(e).
 {¶ 38} Both Rupal and Vijay testified extensively at trial. In arguing that the trial court erred in admitting Rupal's and Vijay's testimony, Minaxi fails to identify any particular statements with which she takes issue or to cite to even a single transcript page as an instance of the alleged error in the approximately three hundred fifty pages of transcript that Rupal's and Vijay's testimony occupies. See App. R. 16(A)(7) (providing the duties of an appellant in demonstrating error). It is axiomatic that Evid. R. 801(D)(2)(e) does not bar every statement of a co-conspirator. See, e.g. State v. Smith, 87 Ohio St.3d 424, 434
(noting that statements of a co-conspirator need not conform to Evid. R. 801(D)(2)(e) if offered for a reason other than to prove the truth of the matter asserted). Without knowing which statements Minaxi contends were admitted in error, this Court cannot determine whether the trial court erred in admitting those statements. Consequently, Minaxi's argument lacks merit. *Page 18 
Attorney Gorman's Statements {¶ 39} Evid. R. 801(D)(1)(b) provides that a prior statement is not hearsay if all of the following elements apply:
 "The declarant testifies at trial * * * and is subject to cross-examination concerning the statement, and the statement is * * * consistent with the declarant's testimony and is offered to rebut an express or implied charge against declarant of recent fabrication or improper influence or motive[.]"
The consistent statements that the offering party seeks to introduce in order to rehabilitate their witness must have been made "prior to the emergence of the improper influence or motive" to fall within the scope of Evid. R. 801(D)(1)(b). State v. Edwards (July 28, 1999), 9th Dist. No. 97CA006775, at *3.
 {¶ 40} Minaxi argues that the trial court erred in admitting the testimony of Rupal's former attorney, Joseph Gorman. The trial court permitted Attorney Gorman to testify in the State's case-in-chief in reliance on State v. Fisher, 9th Dist. No. 20701, 2002-Ohio-3026, after determining that both defense counsels had accused Rupal of changing her statement after receiving a favorable plea bargain. On appeal, Minaxi argues that: (1) only Chetan's counsel accused Rupal of fabricating her testimony, so the introduction of Rupal's prior consistent statements constituted improper bolstering with regard to Minaxi, whose counsel did not accuse Rupal of any improper influence; and (2) Attorney Gorman's testimony, regardless of its content, amounted to improper bolstering of Rupal's credibility because the jury might have been swayed by his sheer status as an attorney.
 {¶ 41} As to Minaxi's first argument, the record reflects that the following exchange took place between her counsel and Rupal on cross-examination:
 "[COUNSEL]: Before you pled guilty to murder, you were looking at aggravated murder, life without parole? *Page 19 
 "[RUPAL]: Yes.
 "[COUNSEL]: Your whole life in prison?
 "[RUPAL]: Yes.
 "[COUNSEL]: And as a result of your plea bargain you now have parole eligibility after 15 years; correct?
 "[RUPAL]: Yes.
 "[COUNSEL]: And the prosecutor is going to send a letter saying that you cooperated?
 "[RUPAL]: Yes."
Contrary to Minaxi's assertion, the record clearly evinces that Minaxi's counsel also accused Rupal of being influenced by the State's offer to write a favorable letter to the parole board after fifteen years.
 {¶ 42} In Fisher, the trial court permitted the State to introduce a witness' prior consistent statement in its case-in-chief after the defense counsel asked the witness, who was incarcerated at the time of trial, if he had cooperated with the State to gain favorable treatment. Id. at ¶ 8. In affirming the trial court's decision, this Court noted the following:
 "During cross-examination, defense counsel questioned [the witness] about his cooperation with the state, suggesting that he was doing so to receive more favorable treatment by the Parole Board. In fact, defense counsel directly asked [the witness] whether the prosecutor had agreed to write a letter to the Parole Board on his behalf in exchange for his testimony. Thus, defense counsel essentially accused [the witness] of having an improper motive or influence to testify and the prior consistent statement was admissible pursuant to Evid. R. 801(D)(1)(b)." Id.
We agree with the trial court that Fisher controls this case. As inFisher, Minaxi's counsel accused Rupal of fabricating her testimony to receive a favorable letter from the State. Because Rupal testified at trial and was subject to cross-examination, her prior consistent statement was admissible pursuant to Evid. R. 801(D)(1)(b), and the trial court did not err in admitting it. *Page 20 
 {¶ 43} As to Minaxi's second argument, we cannot agree that she suffered prejudice merely because an attorney was the one to relay Rupal's prior consistent statement. There is no evidence in the record that the jury looked upon Attorney Gorman's testimony more favorably because of his status as an attorney, and this Court will not rely upon pure speculation in determining whether an error occurred. See State v.Downing, 9th Dist. No. 22012, 2004-Ohio-5952, at ¶ 27. Moreover, Attorney Gorman frankly admitted that he grew frustrated with Rupal because she never told one consistent story from beginning to end and changed the level of her involvement several times over the course of their interviews. Thus, Attorney Gorman's testimony was hardly a shining example of Rupal's credibility. Minaxi's argument that the trial court abused its discretion in admitting Rupal's prior consistent statement through Attorney Gorman lacks merit.
 {¶ 44} Minaxi's third assignment of error is overruled.
 Assignment of Error Number Four "THE TRIAL COURT ERRED IN DENYING A MOTION FOR MISTRIAL BASED UPON THE IMPROPER ACTIONS BY THE INTERPRETER OF PARAPHRASING INSTEAD OF PROVIDING WORD FOR WORD TRANSLATION[.]"
 {¶ 45} In her fourth assignment of error, Minaxi argues that the trial court erred in refusing to grant a mistrial because her interpreter paraphrased interpretations for her rather than giving her a word for word interpretation. We disagree.
 {¶ 46} "When considering a motion for mistrial, the trial court must determine whether the substantial rights of the accused have been adversely affected." State v. Vandyke, 9th Dist. No. 05CA008723,2007-Ohio-1356, at ¶ 10. A court may grant a mistrial when a fair trial is no longer possible. State v. Franklin (1991), 62 Ohio St.3d 118, 127. Great deference is afforded to a trial court's decision regarding a motion for mistrial and the court's ruling will be reversed only *Page 21 
upon the showing of an abuse of discretion. State v. Glover (1988),35 Ohio St.3d 18, 20. An abuse of discretion is more than an error of judgment; it means that the trial court was unreasonable, arbitrary, or unconscionable in its ruling. Blakemore, 5 Ohio St.3d at 219. When applying the abuse of discretion standard, this Court may not substitute its judgment for that of the trial court. Pons, 66 Ohio St.3d at 621.
 {¶ 47} If a defendant cannot understand English, the proper procedure is for a trial court to appoint an interpreter, place that interpreter under oath, and instruct the interpreter to translate for the witness. R.C. 2301.12(A); State v. Negash, 10th Dist. No. 06AP-285,2007-Ohio-165, at ¶ 13. A trial court may not permit an interpreter to interject their own conclusions as to the defendant's answers. State v.Lopez, 6th Dist. No. OT-05-059, 2007-Ohio-202, at ¶ 11, citing State v.Pina (1975), 49 Ohio App.2d 394, 398. See, also, State v. Alvarez, 2d Dist. No. 19670, 2003-Ohio-5094, at ¶ 7. Apart from this restriction, however, trial courts enjoy "considerable latitude" in determining the manner in which translation will be conducted. Lopez at ¶ 11, quotingPina, 49 Ohio App.2d at 399. Verbatim translation is desirable, but not essential, and the trial court has the discretion to determine whether a satisfactory translation occurred. Lopez at ¶ 11, citing Pina,49 Ohio App.2d at 398.
 {¶ 48} Minaxi argues that the trial court erred in failing to grant a mistrial because she was unable to understand and participate in the jury trial process. Minaxi's counsel made a motion for a mistrial at the end of the first day of trial because it became unclear as to whether Minaxi was understanding the proceedings against her. The record reflects that the trial court discharged the jury and had a discussion with both counsel, Minaxi, and her interpreter outside the presence of the jury. Upon the court's questioning, the interpreter admitted that he was paraphrasing the proceedings for Minaxi. The interpreter stated that "[i]f I translate word for *Page 22 
word she does not understand at all." He further explained that given Minaxi's unique dialect and the fact that she had never heard many of the words used in the proceedings, Minaxi seemed to be having an easier time understanding the paraphrasing. Defense counsel informed the court that she had not been aware of any problem with Minaxi's comprehension until that moment and that Minaxi had been able to help in her defense. The trial court also questioned Minaxi's former interpreter who had helped her with interpretation at the police station immediately after her arrest. The former interpreter indicated that Minaxi seemed to have some difficulty understanding at first, but had no difficulty answering questions after a little while. She further indicated that she had performed word for word interpretation for Minaxi, but the pace was much slower and she had been given time to interpret for Minaxi after each sentence.
 {¶ 49} After considering the concerns of both parties, the trial court fashioned the following remedy. The court indicated that the trial interpreters would perform word for word interpretation for Minaxi rather than paraphrasing. The court specified that the interpreters would be given time after each question and after each answer of a witness to interpret for Minaxi. The court also gave defense counsel a copy of the record up until that point, including the court's opening remarks, and ordered the interpreter and defense counsel to review the record with Minaxi, to translate it for her, and to make sure that she had understood the proceedings. The following day, the court asked for a progress report from defense counsel as to her session with Minaxi and the interpreter. Defense counsel indicated that the proceedings up until that point had been discussed with Minaxi, and that Minaxi had understood the testimony and the trial process. Defense counsel requested, however, that the trial proceed at a slower pace and that she be able to consult with Minaxi before each cross-examination. The trial court allowed *Page 23 
this request and also questioned Minaxi again to ensure her understanding. The following exchange took place on the record:
 "COURT: [Minaxi], yesterday you told me that you did not understand what was happening. So, I asked your attorney and the interpreter to spend some time making sure that you understood what's happening in this case. Did that help you, to meet with them yesterday and this morning?
 "[MINAXI]: [Yes.]
 "* * *
 "COURT: [Minaxi], do you understand what is happening in this case to this point?
 "[MINAXI]: Yes.
 "COURT: Do you need any additional time to talk with your attorney about what has happened in the case before we proceed this morning?
 "[MINAXI]: No."
Consequently, the record reflects that the trial court took numerous precautions to ensure Minaxi comprehended the proceedings. Furthermore, the trial court enforced the restrictions that she placed on counsel throughout the trial. The transcripts are replete with instances in which the trial court stopped the witness to allow the interpreter time to interpret for Minaxi. Given the trial court's efforts and Minaxi's indication that she understood the proceedings, we must conclude that the trial court acted within its discretion in refusing to grant a mistrial. Minaxi's fourth assignment of error is overruled.
 Assignment of Error Number Five "APPELLANT WAS DEPRIVED HER RIGHT TO A FAIR TRIAL BY WAY OF THE TRIAL COURT'S DENIAL OF HER MOTION FOR RELIEF FROM PREJUDICIAL JOINDER AND SUBSEQUENT DENIAL OF APPELLANT'S MOTION FOR NEW TRIAL."
 {¶ 50} In her fifth assignment of error, Minaxi argues that the trial court erred in refusing to sever her trial from Chetan's trial. Specifically, she argues that their defenses were mutually *Page 24 
antagonistic, other acts evidence introduced against Chetan prejudiced her as well, and her inability to cross-examine Chetan violated her Confrontation Clause rights. She further argues that her inability to cross-examine Chetan warranted a new trial. We disagree.
 {¶ 51} The law favors joinder. State v. Groce Hopson, 9th Dist. No. 03CA008377, 2004-Ohio-2949, at ¶ 10, citing State v. Franklin (1991),62 Ohio St.3d 118, 122; State v. Thomas (1980), 61 Ohio St.2d 223, 225. Consequently, the criminal rules permit defendants to be indicted together and tried together. Crim. R. 8(B) provides, in part, that:
 "Two or more defendants may be charged in the same indictment, information or complaint if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses, or in the same course of criminal conduct."
Similarly, Crim. R. 13 permits "two or more indictments * * * to be tried together, if the offenses or defendants could have been joined in a single indictment[.]" Joinder is permissible even if not all of the defendants are charged with every count. Groce Hopson at ¶ 12, citingState v. Schiebel (1990), 55 Ohio St.3d 71, 89.
 {¶ 52} While some defenses may be irreconcilable to the point that severance is required, "[m]utually antagonistic defenses are not prejudicial per se." State v. Smith (Jan. 24, 1996), 9th Dist. No. 95CA006070, at *3; Zafiro v. U.S. (1993), 506 U.S. 534, 538. The burden is on the defendant to demonstrate the presence of actual prejudice. SeeSmith at *3. "If it appears that a defendant * * * is prejudiced by a joinder of * * * defendants * * * for trial together * * *, the court shall * * * grant a severance of defendants, or provide such other relief as justice requires." Crim. R. 14. The Ohio Supreme Court has held that:
 "A defendant claiming error * * * under Crim. R. 14 has the burden of affirmatively showing that his rights were prejudiced; he must furnish the trial court with sufficient information so that it can weigh the considerations favoring joinder against the defendant's right to a fair trial, and he must demonstrate that the court *Page 25 
abused its discretion in refusing to separate the charges for trial." State v. Torres (1981), 66 Ohio St.2d 340, syllabus.
An abuse of discretion is more than an error of law or judgment and implies that the court's attitude is unreasonable, arbitrary, or unconscionable. Blakemore, 5 Ohio St.3d at 219. When applying the abuse of discretion standard, an appellate court may not substitute its judgment for that of the trial court. Pons, 66 Ohio St.3d at 621.
 {¶ 53} First, Minaxi argues that the trial court should have severed her trial from Chetan's trial because the State introduced prior acts evidence in Chetan's case that reflected poorly upon Minaxi. During the trial, several witnesses testified about "prior domestic violence situations between Chetan and Sejal." Minaxi admits that none of those instances involved her, but argues that the State used this evidence to show that both she and Chetan disliked Sejal. We fail to see how this evidence prejudiced Minaxi. The primary incidence of domestic violence referred to at trial took place on May 1, 2005, when Minaxi was in India visiting family. Accordingly, Minaxi was not even at home when the event occurred. The only evidence of "disdain" for Sejal that arose from this incident came from Minaxi herself. Vijay testified that he received a phone call from Minaxi when she was in India and after she had heard that the police had arrested Chetan as a result of the May 1, 2005 incident. Vijay testified that Minaxi said, "[t]hat got [Chetan] arrested, why did you not do anything when that bitch got him arrested?" Minaxi fails to explain why this statement would have been inadmissible against her even if the court had severed the two trials. Moreover, as discussed in Minaxi's first and second assignments of error, other evidence in the record apart from Chetan's prior acts supports the conclusion that Minaxi disliked Sejal. As such, Minaxi has not shown that the introduction of prior acts evidence against Chetan prejudiced her to the point that severance was required. *Page 26 
 {¶ 54} Second, Minaxi argues that severance was required because she was prejudiced by her inability to cross-examine her non-testifying co-defendant, Chetan. She avers that the admission of Chetan's statements through Rupal violated the rule in Bruton v. U.S. (1968),391 U.S. 123. In Bruton, the United States Supreme Court held that the lower court erred in refusing to grant a severance after admitting the confession of a non-testifying co-defendant. Bruton, 391 U.S. at 137. The Supreme Court reasoned that the confession's admission violated the appellant's Sixth Amendment right to cross-examine the witnesses against him. Id. Because the confession inculpated the appellant, the prejudice to the appellant was so great that it could not be remedied by instructing the jury to apply the confession only to the confessing co-defendant and not against the appellant. Id. Unlike the co-defendant in Bruton, Chetan never confessed to Sejal's murder. He denied any involvement in her death. Moreover, Minaxi has not identified which of Chetan's statements, introduced through Rupal, allegedly prejudiced her at trial. See App. R. 16(A)(7). She merely refers to statements that "implicate[d] [her] * * * in criminal activity[.]" Without knowing which of Chetan's statements Minaxi believes prejudiced her at trial, we cannot conclude that the trial court abused its discretion in refusing to grant a severance on that basis. See Cardone v. Cardone (May 6, 1998), 9th Dist. No. 18349, at *8 ("If an argument exists that can support this assignment of error, it is not this court's duty to root it out.").
 {¶ 55} Lastly, Minaxi argues that the trial court erred in denying her motion for new trial on the basis that Chetan's statements, as introduced through Rupal, and his "attacks" lodged at her "through comments of [his] counsel" during trial, prejudiced her. Once again, however, Minaxi fails to identify a single statement or to cite to a single transcript reference as an example of Chetan's statements or "attacks." It is the duty of the appellant to demonstrate error on appeal *Page 27 
and to include appropriate citations to the transcripts and record in support of that argument. See App. R. 16(A)(7). Because Minaxi fails to support her argument with even a single citation, her argument lacks merit. See Cardone, at *8. Minaxi's fifth assignment of error is overruled.
 Assignment of Error Number Six "THE NUMBER OF ERRORS COMMITTED DURING THE TRIAL WERE OF SUCH A NUMBER TO QUALIFY AS CUMULATIVE ERRORS WARRANTING A REVERSAL OF APPELLANT'S CONVICTION."
 {¶ 56} In her sixth assignment of error, Minaxi argues that the cumulative errors committed throughout her case deprived her of a fair trial. We disagree.
 {¶ 57} To support a claim of cumulative error, there must be multiple instances of harmless error. State v. Garner (1995), 74 Ohio St.3d 49,64. Cumulative error only exists where the errors during trial actually "deprive[d] a defendant of the constitutional right to a fair trial."State v. DeMarco (1987), 31 Ohio St.3d 191, paragraph two of the syllabus. "[T]here can be no such thing as an error-free, perfect trial, and * * * the Constitution does not guarantee such a trial." State v.Hill (1996), 75 Ohio St.3d 195, 212, quoting U.S. v. Hasting (1983),461 U.S. 499, 508-09. Moreover, "errors cannot become prejudicial by sheer weight of numbers." Hill, 75 Ohio St.3d at 212. Our review of the record convinces us that Minaxi's trial was not plagued by numerous errors and that she received her constitutional right to a fair trial. Minaxi's sixth assignment of error lacks merit.
 III {¶ 58} Minaxi's assignments of error are overruled. The judgment of the Summit County Court of Common Pleas is affirmed.
 Judgment affirmed. *Page 28 
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App. R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App. R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App. R. 30.
Costs taxed to Appellant.
SLABY, P. J. CONCURS
[1] Although Minaxi's captioned assignment of error and heading seek to challenge both children's statements, her argument only addresses the statements of the eldest child, R.P. Accordingly, we limit our analysis to the introduction of R.P.'s statements. See App. R. 16(A)(7).